**Opinion issued August 7, 2025**



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-22-00853-CV

———————————

**CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC, Appellant**

**V.**

**GARETT WILDER, Appellee**

---

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-31428**

---

## O P I N I O N

Appellant, CenterPoint Energy Houston Electric, LLP ("CenterPoint"), challenges the trial court's judgment, rendered after a jury trial, in favor of appellee, Garett Wilder, in Wilder's suit against CenterPoint for negligence. In two issues, CenterPoint contends that Texas Civil Practice and Remedies Code chapter 95

barred Wilder's claim, the evidence was legally and factually insufficient to support the jury's verdict, and the trial court erred in failing to properly instruct the jury and in admitting certain evidence.

We reverse and render.

**Background**

In his third amended petition, Wilder alleged that he was previously employed by L.E. Myers Co. ("L.E. Myers") and worked with a crew near Tomball, Texas. On March 15, 2019, Wilder was instructed by CenterPoint "to come to [its] [concrete electric] transmission pole [number] 18376." CenterPoint "detailed to [Wilder] how to perform the work [it] desired to be completed[,] which included ascending the transmission pole and installing step-bolts with fall protection eyelets." CenterPoint instructed Wilder "to ascend the 100-foot pole." Wilder climbed approximately forty feet up the concrete transmission pole, but then "one of the step-bolts to which [Wilder] was tied off complete[ly] detached from the transmission pole causing [Wilder] to fall to the ground." Upon impact, Wilder's heart stopped. Another L.E. Myers employee performed cardiopulmonary resuscitation ("CPR") on Wilder and revived him. Wilder was taken to the hospital with "severe injuries."

Wilder brought claims against CenterPoint for negligence. Wilder alleged that CenterPoint was negligent in:

    a.    . . . [C]reating and failing to warn of a dangerous condition that posed an unreasonable risk of harm to [Wilder];

2

b. . . . [F]ailing to properly maintain the concrete [transmission] pole in a safe condition;

c. . . . [F]ailing to correct a dangerous condition;

d. . . . [F]ailing to properly reinstall and/or over tightening the hand/footholds after they were initially installed;

e. . . . [F]ailing to publish instructions and procedures on how to install step-bolts on concrete [transmission] poles;

f. Failing to instruct and inform . . . Center[P]oint employees and contractors on the proper procedure to be used when installing step-bolts on concrete [transmission] poles;

g. . . . [F]ailing to inform . . . Center[P]oint employees and contractors that using nine inch step-bolts on concrete [transmission] poles could result in a catastrophic failure;

h. . . . [F]ailing to properly consider or evaluate the inserts in the concrete [transmission] poles in . . . Center[P]oint's design and application of the step-bolts . . . ; [and]

i. . . . [C]ommitting various acts and/or omissions of negligence, both statutory and common law, to be specified in detail at the time of trial.

According to Wilder, CenterPoint's negligent acts and omissions proximately caused his injuries, and he sought damages.

CenterPoint answered, generally denying the allegations in Wilder's petition and asserting that, under Texas Civil Practice and Remedies Code chapter 95, it

3

could not be held liable.[1] CenterPoint also filed a motion for leave to designate L.E. Myers as a responsible third party.[2]

At trial, Wilder testified that he was previously employed by L.E. Myers. While working at L.E. Myers, he had an L.E. Myers supervisor, Marvin Burleson, and L.E. Myers gave him his job assignments as to where and when he was going to work. Wilder's L.E. Myers supervisor gave him instructions on how to do his job.

Upon being hired by L.E. Myers, Wilder received training by watching "new hire safety videos" and learning "how to run [a] hand line." He also received training from L.E. Myers to work as a transmission technician as well as training for climbing towers and transmission poles with step bolts on them.[3] Wilder also had to "climb with a buddy the first couple of days, week" to make sure that he was climbing a

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003 ("A property owner is not liable for personal injury, death, or property damage to a contractor, subcontractor, or an employee of a contractor or subcontractor who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace unless: (1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn."). CenterPoint also moved for summary judgment, arguing that it was entitled to judgment as a matter of law because Texas Civil Practice and Remedies Code chapter 95 barred Wilder's claim. The trial court denied CenterPoint's summary-judgment motion.

[2] *See id.* § 33.004.

[3] As part of his training, Wilder learned that he should check the step bolts as he was climbing a tower or transmission pole, and before he put his weight on a step bolt, to make sure that it was in good condition.

4

tower or transmission pole correctly. Initially, Wilder was authorized to only be "[t]he lowest man on the tower," but he progressed so that his L.E. Myers supervisors allowed him to climb higher than forty feet up a tower or transmission pole. L.E. Myers "determined when [Wilder] w[as] ready to climb [transmission] poles or towers on [his] own."

While he worked for L.E. Myers, Wilder was a part of the "[s]tep bolt crew," and his job was "installing step bolts on . . . different types of structures." As part of the step bolt crew, Wilder climbed more than 100 towers and transmission poles. The climbing structures that Wilder climbed were owned by CenterPoint, but it was Wilder's L.E. Myers supervisor who assigned him the work he was to do. Wilder's supervisor would tell him which transmission poles to climb and the work to be performed; the details of his work came from his L.E. Myers supervisor. Occasionally, CenterPoint supervisors were present when Wilder was climbing towers and transmission poles. Wilder was never reprimanded by L.E. Myers supervisors or CenterPoint personnel for how he climbed; he was never told that his climbing was unsafe. Wilder acknowledged that CenterPoint did not give him instructions on how to do his job; Wilder's L.E. Myers supervisor told him which step bolts to use on each structure he climbed. Wilder knew that different climbing structures required different step bolts.

As to the day of his fall, Wilder testified that on the morning of March 15, 2019, he was working for L.E. Myers, and Burleson, his supervisor, gave him his job assignment that day. According to Wilder, he showed up to work at a jobsite, and CenterPoint "came and told . . . [his L.E. Myers] supervisor that [someone] needed to go and . . . fix [a] concrete [transmission] pole" because "there were four [step] bolts missing up at the very top that needed to be installed." Chris McClain, one of Wilder's L.E. Myers coworkers, then came up to Wilder and said that they "need[ed] to go." Wilder "reported to th[e] [concrete transmission] pole," number 18376,[4] along with McClain, and Chris Beach from CenterPoint. Beach told McClain and Wilder that "there were four missing step bolts at the very top [of the concrete transmission pole] that needed to be installed." Wilder and McClain were tasked with installing the four missing step bolts at the top of the transmission pole; they were doing work to either repair or modify the concrete transmission pole. Neither Wilder nor McClain were told that "there were any loose [step] bolts that had been discovered []or had been tightened on th[e] pole" before they began their work. Wilder noted that if he encountered a loose step bolt, he would try to fix it, and if he could not, he would come down off the concrete transmission pole. Wilder

---

[4]     Wilder noted that the step bolts on the concrete transmission pole had been installed by L.E. Myers.

was not told that a loose step bolt meant that an "insert[]" in the pole was broken and he would need to climb down if he encountered one.

Wilder further testified that he and McClain decided that he would climb the concrete transmission pole, and Wilder got his harness. McClain and Beach got "the [step] bolts ready for [Wilder] to go" by "put[ting] a nut on" them and a "D-ring." Another nut was placed at the end of the step bolt "to keep it in place while [Wilder was] climbing." Before climbing the concrete transmission pole, Wilder put on his harness and lanyards. McClain and Beach helped Wilder load the step bolts "into [his] ditty bag, which [was] a bag that h[ung] off [his] harness that [he] c[ould] put tools and materials in." Wilder checked his equipment before he began to climb.

According to Wilder, an L.E. Myers truck was moved closer to the concrete transmission pole so that he could stand on it and reach the bottom level of the step bolts on the pole. Wilder got on the concrete transmission pole and "tie[d] off," meaning he "clipped in" using his lanyard, so that he would be protected from a fall. Wilder had been trained to do a "100 percent tie-off," which he did that day.

Wilder began climbing the concrete transmission pole, "moving [his] lanyards up one at a time to maintain 100 percent tie-off." As he moved, Wilder was required to have "one lanyard clipped in," but not both lanyards because he needed to move. McClain and Beach watched Wilder as he climbed the concrete transmission pole. Neither of them indicated that Wilder was doing anything unsafe as he climbed.

7

As Wilder climbed the concrete transmission pole, he did not find any missing step bolts, and he did not find any loose step bolts or ones that would have caused him concern. He checked each step bolt before he put his weight on it. At one point, Wilder moved his lanyard and clipped it into a certain step bolt. When Wilder clipped in, the step bolt did not move or shake. Wilder noted that he would have checked the step bolt to make sure that it was tightened into the insert properly before he clipped into it. He then proceeded to remove his lanyard for the step bolt below so that he could climb higher. As that happened, though, the step bolt which his lanyard was clipped to came out. There was no warning that there was a problem with the step bolt; it failed suddenly. Wilder did not remember anything after that. He woke up in the hospital.

Wilder noted that at the time of his fall, Beach was not engaged in any activity associated with Wilder's work, and there were no other CenterPoint employees "engaged in an activity at the concrete [transmission] pole" when Wilder fell. Wilder did not know on whose property the concrete transmission pole was located.

Beach, a CenterPoint employee, testified that he had worked for CenterPoint for sixteen years. At the time of Wilder's fall, Beach worked as a "head line mechanic" and a contract inspector. In his job, he had interactions with L.E. Myers.

Beach further testified that in November 2018, L.E. Myers got involved in a project to change, replace, or install step bolts on different structures for CenterPoint.

Beach estimated that about 180 to 200 structures needed step bolt installation or replacement. On some structures, the existing step bolts needed to be unscrewed or unbolted and replaced with new step bolts that CenterPoint provided. CenterPoint provided multiple types of bolts to L.E. Myers to use on different structures. L.E. Myers received both 9-inch long step bolts and "7-and-a-quarter" inch long step bolts from CenterPoint; those step bolts were different and were to be used on different structures. Beach's role in the overall project was to make sure that L.E. Myers's crews were performing the work they were assigned and to "help get material back and forth." Beach was not involved in climbing the towers or transmission poles; he expected L.E. Myers to make sure that its employees were doing their work properly.

According to Beach, the concrete transmission pole from which Wilder fell, number 18376, was owned by CenterPoint; it was a permanent fixture. That pole had "an insert." The step bolts screwed into the concrete transmission pole itself. A "7-and-a-quarter" inch step bolt was to be used on the transmission pole from which Wilder fell.

Beach explained that before Wilder's fall in March 2019, other work had been performed on the concrete transmission pole. On January 11, 2019, "there was a maintenance concern" at the pole, and several CenterPoint inspectors responded, including Cody Jackson. That issue involved a malfunctioning light, or a light that

9

was out at the top of the pole and needed to be fixed. Beach did not know if Jackson climbed the concrete transmission pole on January 11, 2019. Between January 11, 2019 and March 7, 2019, Jackson did not visit the concrete transmission pole again.

Beach also recalled that Jackson, after his January 11, 2019 visit to the concrete transmission pole, called him to tell him that "there was a problem with th[e] [concrete transmission] pole" and "step bolts needed to be installed." Thus, on February 13, 2019, L.E. Myers employees went out to install step bolts on two concrete transmission poles, numbers 18375 and 18376—the one from which Wilder fell.[5] When Beach arrived at the location on February 13, 2019, L.E. Myers employees had already ascended concrete transmission pole number 18375; Beach did not go over to pole number 18376. Burleson assured Beach that L.E. Myers was using the "7-and-a-quarter" inch step bolts on the poles, and Beach had no indication that L.E. Myers was installing the incorrect step bolts into the concrete transmission poles. Beach did not identify any 9-inch step bolts on the concrete transmission poles, and he was not aware that some step bolts did not get installed by L.E. Myers. Because Beach remained on the ground while L.E. Myers employees worked on the

---

[5]     A material request for step bolts for the concrete transmission pole was made by L.E. Myers on January 21, 2019. "7-and-a-quarter" inch step bolts were obtained by L.E. Myers on or around January 22, 2019. Beach spoke to Burleson directly and told him that the "7-and-a-quarter" inch step bolts were available for use.

10

poles, it was impossible for Beach to identify which step bolts had been installed by L.E. Myers.

Beach further testified that on March 7, 2019, CenterPoint inspectors went to transmission pole number 18376 to replace the lighting. Jackson climbed the concrete transmission pole that day. Afterwards, he called Beach and told him that he had made the necessary repairs to the light, but he found "some insert areas that did not have . . . step bolt[s]" and some step bolts that were loose. Jackson also told Beach that he had moved a step bolt, and he had tightened some step bolts. Jackson did not tell Beach that there were any 9-inch step bolts installed on the concrete transmission pole. The fact that Jackson had to tighten some loose step bolts did not mean that Beach was aware that there was something dangerous about the pole, and it did not indicate that there was something wrong with "the inserts in the [concrete transmission] pole." Beach called L.E. Myers to tell Burleson that step bolts needed to be installed on the concrete transmission pole in the locations where there were none. CenterPoint did not believe that the concrete transmission poles were hazards themselves.

On March 15, 2019, L.E. Myers sent a crew, which included Wilder, to address the step bolts on the concrete transmission pole, and Beach met the crew at the pole. Beach's role that day was serving as a liaison for L.E. Myers, one of

11

CenterPoint's independent contractors.[6]  Beach, Wilder, and McClain discussed the kind of step bolts that needed to be installed and the location.  Wilder put on his climbing gear, and Wilder and McClain pulled their L.E. Myers truck close to the concrete transmission pole so that Wilder could stand on it to begin climbing.  Beach could not recall if he helped McClain assemble the step bolts that day.  Beach watched as Wilder climbed the pole and saw that he was using a harness and lanyard system.  Beach did not see Wilder fall from the concrete transmission pole; at the time of the fall, he was in his truck responding to e-mails.  When Beach heard the impact of Wilder hitting the ground, he looked.  Beach estimated that Wilder fell about forty to fifty feet, and Wilder landed feet first before collapsing.  Beach called for emergency assistance while McClain attended to Wilder.

After Wilder's fall, McClain recovered a fallen step bolt from the ground, and Beach became aware that a 9-inch step bolt, rather than a "7-and-a-quarter" inch step bolt, had fallen out of the concrete transmission pole.  Beach stated that prior to Wilder's fall, he had no reason to doubt that L.E. Myers had installed the correct step bolts, i.e., the "7-and-a-quarter" inch step bolts, on the concrete transmission pole.  According to Beach, Burleson created a spreadsheet that said a

---

[6]    Beach explained that as an independent contractor, L.E. Myers brought its own equipment, including bucket trucks, boom trucks, and climbing gear, as well as its own personnel to perform the job.  CenterPoint did not direct L.E. Myers on how to perform its job.  L.E. Myers never told CenterPoint that it did not have the ability to install step bolts on concrete transmission poles.

12

"7-and-a-quarter" inch step bolt was to be used on the concrete transmission pole, and the type of step bolt used for a concrete transmission pole was noted in the plan for the overall project.[7] The step bolt project that Wilder was involved in was the first time that CenterPoint had implemented the use of a "7-and-a-quarter" inch step bolt on a project.

Beach further testified that L.E. Myers was not given any instructions on how to install the step bolts on the concrete transmission pole because "it [was] a generic task for all linemen to do." Installing step bolts was part of the daily job, and Beach expected that linemen, like those employed by L.E. Myers, would be able to install step bolts into a concrete transmission pole. Step-by-step instructions from CenterPoint were not necessary. Thus, CenterPoint had not articulated a policy, either in writing or verbally, on how to install its "7-inch-and-a-quarter" inch step bolts on concrete transmission poles. Neither Beach, nor anyone else at CenterPoint, controlled the details or manner of the work performed by L.E. Myers.

Beach also testified that, to his knowledge, no one had reported that the step bolt involved with Wilder's fall was loose before the fall occurred. If Beach had

---

[7]  Beach testified that Burleson received a work order, which included a specific section for each of the types of structures that L.E. Myers would be working on. That section conveyed the specific type of step bolt that went with each type of structure. The "Safety steps for concrete poles" section told L.E. Myers which step bolts to use on the concrete transmission poles. (Internal quotations omitted.) Beach and Burleson also had a conversation about which step bolts to install on the concrete transmission pole.

known about the loose step bolts and that a loose step bolt indicated that there was a broken insert in the concrete transmission pole, he would not have let Wilder climb the pole. But he noted that a loose step bolt did not automatically mean that an insert was broken. If CenterPoint knew that something would be dangerous to a worker, it had an obligation to convey that to L.E. Myers. There was nothing about the concrete transmission pole on March 15, 2019 that indicated to Beach that it was dangerous or created an unreasonable risk of harm.

McClain, Wilder's L.E. Myers co-worker, testified that he became employed by L.E. Myers in about 2018 as a "tower technician step 2." While employed by L.E. Myers, McClain worked on the project where L.E. Myers was replacing and installing step bolts on CenterPoint structures. McClain had an L.E. Myers supervisor, Burleson, from whom he received his job assignments, and he had brought his own tools with him to a job. Burleson directed the details on McClain's work. CenterPoint did not give McClain instructions on how to install step bolts on their structures, and McClain noted that installing step bolts was a common thing for linemen to do.

McClain further stated that as to the step bolt project, it was not brought to his attention that there were different lengths of step bolts, just different diameters. Before being involved with the concrete transmission pole from which Wilder fell, McClain had only installed step bolts on towers and steel poles, but it was part of his

14

job to address the step bolts on the concrete transmission pole. CenterPoint had conveyed to McClain that if loose step bolts were encountered while climbing, then they needed to be tightened. He was not told that a loose step bolt on a concrete transmission pole could be a sign that the insert in the pole was broken.

When McClain arrived at the site of the concrete transmission pole in February 2019, Beach and Burleson were present. Before the step bolts were installed on the pole, McClain looked at them and "saw how they were to be installed." Beach was present for that conversation and saw the step bolts that were going to be used. McClain was not told that the step bolts were the wrong length. McClain did not ask Beach any questions about the installation of the step bolts.

According to McClain, in February 2019, the concrete transmission pole had step bolts already installed on the right side, but there were none installed on the left side. McClain intended to replace the existing step bolts on the right side and install step bolts on the left side; this was what Burleson had instructed him to do. As he installed the step bolts, about three or four times, an "insert . . . would not accept [the] step bolt." In that instance, the step bolt would not thread into the insert inside the concrete transmission pole. McClain's supervisor told him to make sure the step bolts were secured, and if he was unable to do so, then to leave the hole open. McClain was able to climb to the top of the pole and back down. The step bolt that Wilder eventually fell from was installed by McClain; when installing it, he would

have checked to make sure it was tight. McClain would have also put his weight on that particular step bolt, but he did not notice any problems with the step bolt. The step bolt did not appear to be dangerous to him, and he did not believe that there was a danger that it would come out of the concrete transmission pole.

On a later day, McClain was told by his L.E. Myers supervisor that he needed to go back to the concrete transmission pole and "put step bolts in," so he and Wilder went to the site. When they arrived, they talked about what needed to be done, and Beach, who was also present, told Wilder to take photographs of the holes. According to McClain, he and Wilder discussed how to install the step bolts and what step bolts to use with Beach present. Wilder then put on his fall protection, took the step bolts, and started climbing the concrete transmission pole. McClain could not recall who prepped the step bolts that day.

McClain watched Wilder climb the concrete transmission pole, and Wilder did not show that he had any problems climbing. Wilder maintained "100 percent tie-off" and "three-point contact" as he climbed. Wilder checked the step bolts before he put his weight on them, and there was no indication that there was a problem with the particular step bolt that came out of the pole. McClain did not see the exact moment when Wilder fell, but he saw him in the air and then hit the ground. Wilder landed on his feet and then his "body just kind of crunched forward and . . . he fell on his back." McClain began CPR, and Beach called for emergency

16

assistance. A step bolt from the concrete transmission pole was on the ground under Wilder's back, and it was still hooked to his lanyard. Wilder regained consciousness at the site and was subsequently taken to the hospital.

McClain noted that he did not recall being given instruction by CenterPoint on the method of how to install the step bolts on the concrete transmission pole.

Jackson, a CenterPoint employee, testified that in 2019, he worked as a journeyman lineman for a light crew. While working for CenterPoint in 2019, Jackson visited the concrete transmission pole from which Wilder fell three times. A part of his job responsibilities was to make sure that the light at the top of the concrete transmission pole was functioning correctly. On January 11, 2019, Jackson visited the concrete transmission pole to fix a problem that did not require him to climb the pole. Later, after January 11, 2019, but before March 15, 2019, Jackson returned to the concrete transmission pole twice to fix the nonfunctioning light at the top of the pole. He was only able to climb to the top of the pole on one occasion though.

According to Jackson, when he first visited the concrete transmission pole to attempt to fix the light, there were no step bolts on the left side of the pole, so he and his crew tried to install some step bolts that day.[8] There was one spot on the

_____

[8] Jackson noted that he was not told by CenterPoint that "7-and-a-quarter" inch step bolts were to be used on a concrete transmission pole. He did not believe that he

transmission pole where he attempted to install a step bolt into a particular hole, but he could not do so because the threads on the inside of the pole were "gnarled," and Jackson did not have the right tool to "try to clear it out." Because Jackson needed that step bolt to continue climbing up the pole, he climbed down the concrete transmission pole and called his foreman to tell him that he was unable to insert a particular step bolt to continue climbing and that the work on the light could not proceed until the step bolt issue was dealt with.

Because CenterPoint already had a crew from L.E. Myers "putting step[] [bolts] in all of [CenterPoint's] structures," L.E. Myers was called to come out and put step bolts in the concrete transmission pole so that CenterPoint would be able to fix the light at the top of the pole. According to Jackson, any step bolts that he had previously added to the concrete transmission pole were taken out by L.E. Myers when they worked on the pole. L.E. Myers put different step bolts in the concrete transmission pole; L.E. Myers replaced all the step bolts in the pole.

On March 7, 2019, Jackson was informed that step bolts had been installed on the concrete transmission pole, so he returned to the pole to fix the light. Jackson's visit to the concrete transmission pole occurred before Wilder's fall on March 15, 2019. The step bolts that were in the pole on March 7, 2019 were the ones installed

was provided with such step bolts either. Jackson did not know the length of the step bolts that he tried to install in the concrete transmission pole.

18

by L.E. Myers. Although Jackson was able to climb the concrete transmission pole and fix the light, he reported to his foreman that "all the step bolts were not installed" in the pole and additional step bolts needed to be installed. Jackson did not report that the wrong length of step bolts had been used on the pole because he did not know about the different lengths of step bolts at the time.

Jackson further noted that while climbing the concrete transmission pole on March 7, 2019, he encountered some step bolts, between one and ten, that were loose,[9] so he tightened them with a crescent wrench as he climbed up the pole. The step bolts that Jackson tightened were on the right side of the pole. He did not have any problems with the inserts holding the step bolts that he tightened. Jackson also had to move one step bolt at the top of the concrete transmission pole so that he could perform his work on the light, but that step bolt was not near the location where Wilder fell off the pole. Jackson did not notice anything unexpected or different about the length of the step bolts in the concrete transmission pole while he was there fixing the light.

On March 7, 2019, Jackson was safely able to climb up the concrete transmission pole and climb back down. He did not encounter any step bolts that

---

[9] Jackson determined that a step bolt was loose when it rotated as he put his hand on it. He checked every step bolt before he put his weight on it. Jackson was never told that a loose step bolt could indicate a broken insert in the concrete transmission pole.

came out of the pole as he climbed, and he did not see any abnormal step bolt holes in the pole. Jackson tightened every loose step bolt that he found; he had no concerns about the safety of the step bolts after he tightened them. No step bolts moved when Jackson climbed down the concrete transmission pole. Following Jackson's work on the concrete transmission pole, he and his foreman spoke to Beach to let him know that there were step bolts missing on the pole. Jackson was not aware of anything dangerous about the step bolts or the inserts in the concrete transmission pole after he completed his work. The only thing that needed to be done to install the missing step bolts. In his mind, it was safe for someone else to climb back up the concrete transmission pole.

As to the step bolt that came out of the concrete transmission pole when Wilder fell, Jackson testified that a step bolt was never meant to be in that hole. That hole in the pole was "only for positioning," and it is not to be used for climbing. Jackson could not recall if he reported that there was a step bolt inserted in a non-climbing hole on the pole. Jackson did not have anything to do with the step bolt project that L.E. Myers was performing for CenterPoint.

Michael Pakeltis, the director of transmission operations for CenterPoint, testified that CenterPoint did not know why Wilder's fall happened. CenterPoint relied on its independent contractors to perform their own safety investigations related to their employees and inform CenterPoint of the root cause of any injuries.

According to Pakeltis, L.E. Myers was hired to perform the work for CenterPoint's obstruction lighting project, which involved replacing and installing step bolts on different CenterPoint structures, including steel poles, steel towers, and concrete transmission poles.[10] Work started on the project in October 2018. CenterPoint gave L.E. Myers the step bolts, which it had purchased from a third party, to be used on the project. CenterPoint told L.E. Myers which bolts went with which structures in writing and orally through Beach, and CenterPoint told L.E. Myers the specific structures that needed step bolts. CenterPoint did not give specific instructions to L.E. Myers on how to install the step bolts. It was normal for linemen to be trained that if they encountered a loose step bolt, it should not be climbed until it is either repaired or secured.[11] L.E. Myers completed its installation of step bolts on the concrete transmission pole around February 13, 2019.

---

[10]    Pakeltis noted that CenterPoint had been engaged in projects with L.E. Myers for more than twenty years. L.E. Myers had been a long-term contractor and had built hundreds of projects for CenterPoint. As to the contract for the obstruction lighting project, it provided, among other things, that CenterPoint "retain[ed] no control or direction over [L.E. Myers] or [L.E. Myers] personnel regarding the detail, manner or method of the performance of the work by [L.E. Myers] or [L.E. Myers] personnel."

[11]    According to Pakeltis, "[t]here [was] a natural vibration of all transmission lines called Aeolian vibration" and this could cause "vibrations in structures" and step bolts and nuts to loosen. That was "why the linemen [were] trained to test th[e] climbing bolts and things to make sure that they [were] tight because [there was] a natural phenomenon that could be a reason why the [step] bolts may have loosened."

As to the specific types of step bolts, Pakeltis explained that a 9-inch step bolt should not be used on a concrete transmission pole because it had "too long of a thread length." "[T]he threads [would be] exposed once [it was] screw[ed] . . . into the insert, which [was] not the maximum holding strength of the step." A shorter step bolt was needed so that there was a "shorter thread," and the thread would not be exposed, allowing for the bolt to have "maximum capability." CenterPoint determined that a "7-and-a-quarter" inch step bolt should be used on the concrete transmission poles before the obstruction lighting project began. L.E. Myers was given "7-and-a-quarter" inch step bolts by CenterPoint. CenterPoint did not have a written procedure about how to specifically install a "7-and-a-quarter" inch step bolt into a concrete transmission pole, but CenterPoint did not think it was necessary.

Pakeltis further testified that before the obstruction lighting project began, CenterPoint was aware that "[t]he geometry would allow" a 9-inch step bolt to potentially "bottom out in . . . the[] inserts in the concrete [transmission] poles," but only if the step bolt "was torqued after it bottomed out."[12] That was a consideration when CenterPoint designed the shorter step bolt for the concrete transmission poles;

---

[12]    Pakeltis explained "bottoming out" as: "The insert is a U-shaped item[,] and it has an opening[,] and it has a bottom to it. When you screw the bolt into the insert, the bolt will eventually hit the bottom of the insert base and that's what [is] consider[ed] to be bottoming out." Further, Pakeltis noted that when "bottoming out" occurs, if weight is put on the step bolt and if a person "twist[ed] the bolt, torsionally [he] c[ould] break the insert out of the pole," which was known as "stripping out."

CenterPoint employees were informed that a 9-inch step bolt "could bottom out and cause an issue with . . . the insert" in the concrete transmission pole. If an insert was damaged, a step bolt would become loose. Testing revealed that the "7-and-a-quarter" inch step bolt would not bottom out when used on a concrete transmission pole. Pakeltis noted that it would be obvious to the linemen that a 9-inch step bolt thread was longer than the insert on the concrete transmission pole and should not be used. If the proper "7-and-a-quarter" inch step bolt was used, there would be no visible threads so the linemen would know that it was properly installed.

As to Jackson, Pakeltis stated that he believed that Jackson knew that a concrete transmission pole used a different step bolt than the 9-inch step bolt. Pakeltis recalled that Jackson reported to CenterPoint that there were step bolts missing on the concrete transmission pole from which Wilder fell and that he had to tighten several loose bolts as he climbed the pole.

According to Pakeltis, L.E. Myers installed the wrong length step bolts in the concrete transmission pole in February 2019. Part of the insert in the pole from which Wilder fell appeared to have broken out of the pole. An insert in a concrete transmission pole would not be damaged simply because a step bolt was loose though, and a loose step bolt would not indicate damage to the insert. If a step bolt

23

is ever loose, a lineman should tighten it, and if it did not tighten, then it should be removed from the pole.

Additionally, Pakeltis noted that the concrete transmission pole was located on an easement and was maintained and utilized as part of CenterPoint's business. Wilder and his coworkers were modifying the concrete transmission pole as part of the obstruction lighting project.

Dr. George Ross testified that he worked at an engineering consulting firm as an engineer. Related to the instant case, he was retained by Wilder to look at the incident and try to determine why the step bolt failed and why the incident occurred. He did no testing and had no experience in the public utility field. He also had not done any work involving concrete utility poles and had no prior experience with the inserts involved in this case. This was the first time that he was involved in analyzing inserts for utility poles.

According to Ross, CenterPoint had designed a "7-and-a-quarter" inch step bolt to be used on the concrete transmission pole and the step bolt was to be threaded into an insert in the pole. The step bolts and the inserts were made of two different types of materials, and "[t]he material strength of the insert [was] about a third of that of the [step] bolt." Ross did not believe that CenterPoint had examined the strength of the inserts in the concrete transmission pole before its obstruction light project began which was something Ross would have recommended testing before

24

the project. Ross also did not think that CenterPoint "determine[d] what [was] the minimum thread engagement . . . for the system to work."

In Ross's opinion, CenterPoint should have told L.E. Myers "a bolt description, the minimum and maximum thread engagement and the installation torque" for the installation of the step bolts on the concrete transmission pole. According to Ross, if L.E. Myers "would have been instructed[] [and] given a description of the [step] bolt," the correct step bolt would have been put "in the right hole" on the concrete transmission pole. However, Ross did acknowledge that L.E. Myers was given a work order that told it to install "7-and-a-quarter" inch step bolts into the concrete transmission poles.

Ross further testified that L.E. Myers installed the incorrect step bolts into the concrete transmission pole from which Wilder fell. However, Ross opined that the step bolt should have held Wilder if the insert inside the pole was in good condition. Thus, in Ross's opinion, there must have been damage to the insert, and he believed that Jackson damaged the insert when he climbed the concrete transmission pole and tightened "something up" in March 2019. But Ross also stated that he had no evidence of this, and he had no evidence that the step bolt had been "overtorqued." Additionally, Ross noted that he did not have experience with the particular type of insert failure involved in the instant case, and he testified that he did not know how

the insert was damaged. He had not seen insert failures before, just thread and bolt failures, and he characterized Wilder's fall as sudden and unexpected.

On cross-examination, Ross acknowledged that he had no idea how the insert failed in this case or how it was damaged. He had performed no testing on the insert and no testing on any step bolts. Testing completed by CenterPoint both before and after Wilder's fall showed that the step bolts and the insert involved in the case "met the . . . requirements" of the Occupational Safety and Health Administration ("OSHA"). Further, according to Ross, although a 9-inch step bolt was installed in the concrete transmission pole, rather than a "7-and-a-quarter" inch step bolt, the system, i.e., insert and step bolt, should have held more than 600 pounds, and with the 9-inch step bolt being inserted about one inch, as it was in this case, bottoming out would not have occurred. Instead, more than "250 pounds of torque" would have needed to be applied for the insert to fail, and Ross did not think that had happened in this case. Ross could not say that the step bolt involved had been "overtorqued," and it did not appear to him that the step bolt involved had ever "bottomed out."[13] Ross also had no evidence that cross-threading had occurred.

Ross did not know why the insert broke in the concrete transmission pole. CenterPoint should not have anticipated the failure of the insert "on the day of the

---

[13]    Ross testified that the step bolt that fell out of the concrete transmission pole was on the left side of the pole.

accident," and Jackson would not have been aware of a problem with the step bolt before Wilder fell.[14] Additionally, nothing would have alerted Wilder, or anyone, that the step bolt might fail. The failure was sudden and without warning. No one would have known that the step bolt and insert would fail, and that Wilder would fall. Ross acknowledged that Jackson never testified that he had specifically tightened the step bolt from which Wilder fell when he climbed the concrete transmission pole on March 7, 2019. According to Ross, CenterPoint neither designed nor manufactured the insert or the concrete transmission pole.

Morris Mach, who was retained by Wilder, testified that he had been a lineman for more than thirty-five years, with the majority spent in the utility industry. He worked to train linemen as well. During his career, he had climbed electrical poles and tower structures, and he had installed step bolts on towers and concrete transmission poles, once or twice. When installing step bolts on a concrete transmission pole, the contractor that Mach worked for gave him "steps" to use; "they had marked how much thread . . . had to [be] engage[d] into the pole itself to make it safe" and provided information about the torque to be used. Mach did not think that climbing concrete transmission poles and installing step bolts was a routine activity for linemen.

---

[14]   Ross noted that a loose step bolt did not necessarily indicate a problem with the insert in the concrete transmission pole. If a loose step bolt was able to be tightened appropriately, then there would be no indication that an insert was broken.

27

Mach further testified that he did not believe that L.E. Myers, although involved in the construction and maintenance of power lines, was an expert in the installation of step bolts in concrete transmission poles. To comply with OSHA requirements, CenterPoint needed to provide information to L.E. Myers about "anything that concern[ed] safety," "for example, if they have something unique within their system, . . . they [had to] convey that information to [L.E. Myers] for basically safety." Mach would have expected CenterPoint to "make sure the right step bolts [were] being used" and to have brought to the attention of L.E. Myers any abnormalities with the particular concrete transmission pole that CenterPoint was aware of. Mach did not believe that CenterPoint conveyed any information about the condition of the concrete transmission pole, but he admitted that there were no known hazards related to the condition of the pole. As to the "identity of operation and safety steps for concrete poles," CenterPoint told L.E. Myers that "the material is an adapter 5/8-inch step bolt fall attachment" and the step bolts were "HS dome, HX, 5/8th times 7-inch by a quarter." CenterPoint owned the concrete transmission pole from which Wilder fell and the step bolts installed into the pole.

According to Mach, before Wilder's fall, Jackson went up the concrete transmission pole and identified that "there [were] some loose bolts," "some gnarled threads in the bolt itself," and "missing steps as well." Mach did not think that CenterPoint told L.E. Myers about the "gnarled cross threads" or "loose bolts." But

28

Jackson tightened the loose step bolts that he found, and Mach opined that there was a risk that Jackson could have "bottomed out the insert" in theory. Mach believed that a loose step bolt would be a red flag that would warrant further investigation; however, he also stated that a step bolt might be loose simply because the installer did not tighten it enough at installation, and it was important for Jackson to tighten the loose step bolts that he found. Jackson did not have any problems with the step bolts in the concrete transmission pole after he tightened them.

Mach also opined that Beach did not know that the wrong step bolt was installed in the concrete transmission pole. Mach believed that a "failed step bolt" led to Wilder's fall on March 15, 2019. L.E. Myers never reported any hazardous conditions about the concrete transmission pole to CenterPoint.

On cross-examination, Mach testified that during his career, he had installed step bolts on a concrete transmission pole on one occasion, and on another occasion, he supervised the installation of step bolts on a concrete transmission pole. This occurred almost thirty years ago. CenterPoint had designed its step bolts well, and they could not be "over-install[ed]" into a pole.

As to the relationship between L.E. Myers and CenterPoint, Mach explained that L.E. Myers was an independent contractor who was "hired to perform specific work using its own means, methods[,] and manner in the performance of that work." The contract between CenterPoint and L.E. Myers stated that CenterPoint "retain[ed]

29

no control or direction over" L.E. Myers "regarding the detail, manner or methods of performance of the work" by L.E. Myers or L.E. Myers's personnel. (Internal quotations omitted.) This meant that CenterPoint did not have the right to control the details or performance of L.E. Myers's work. Instead, the parties' contract provided that L.E. Myers would "coordinate and direct" its employees' work. (Internal quotations omitted.) Further, L.E. Myers had the duty to supervise the work of its employees and to make sure that its employees were doing the work correctly, with the proper materials. CenterPoint did not have a responsibility to supervise L.E. Myers's employees. L.E. Myers was required to make sure that its employees were properly trained.

Mach also testified that the work order provided to L.E. Myers by CenterPoint gave written instructions for the location for the installation of the "7-and-a-quarter" inch step bolts in the concrete transmission pole. It was possible that Beach did not know that L.E. Myers was installing the wrong step bolts in the concrete transmission pole, and it was L.E. Myers's responsibility to make sure that the right materials were being used. By not installing the correct step bolts in the concrete transmission pole, L.E. Myers did not comply with the standard of care.

Mach further acknowledged that linemen worked with step bolts and thread connections every day. Linemen were required to be familiar with step bolts and to know "when something [was] being cross-threaded." But there was no evidence in

30

this case that the step bolt involved in Wilder's fall was cross-threaded, and Jackson's tightening of step bolts on the concrete transmission pole would not have caused cross-threading. If there were step bolts on the concrete transmission pole that were cross-threaded, that would have been done by L.E. Myers employees. According to Mach, the installation of step bolts was not a complicated process, and linemen did not need a drawing to show them how to install a step bolt.

As to the reason for Wilder's fall, Mach did not see any evidence that the insert involved in the case had "bottomed out." Mach did not know why the step bolt involved in Wilder's fall failed, and he did not know whether the installation of the wrong step bolts in the concrete transmission pole by L.E. Myers had anything to do with causing the fall. Mach noted that the step bolt involved in Wilder's fall was installed close to the appropriate insertion depth; so even though it was the wrong-sized bolt, it was installed correctly, and the step bolt did not show any signs of distress or bending. Instead, the insert itself suddenly failed, without warning to anyone, resulting in Wilder's fall. There was no way for anyone to know that the step bolt would fail, and there was no forewarning. L.E. Myers had never told CenterPoint that it was unable to install step bolts into the concrete transmission pole or that any inserts were damaged. If Wilder had checked the step bolt before he put

31

his weight on it, and there was no indication of a problem, there would have been no notice that the step bolt was any kind of hazard.[15]

The jury found in favor of Wilder on his negligence claim. Specifically, the jury found that CenterPoint "exercise[d] some control over the manner in which the defect-producing work was performed, other than the right to order the work to start or stop or to inspect progress or receive reports." Further, the jury found that the negligence[16] of CenterPoint "proximately cause[d] the occurrence in question," and the jury determined that CenterPoint was fifty-one percent responsible for "the occurrence." The jury awarded Wilder $15,466,597 in damages on his negligence claim.

The trial court entered judgment based on the jury's findings, awarding Wilder $15,466,597 on his negligence claim, plus interest and court costs.

---

[15] We note that additional witnesses testified at trial. The Court has reviewed the complete record in this appeal, including all testimony and evidence presented to the trial court. *See* TEX. R. APP. P. 47.1; *Obernhoff v. Nelson*, No. 01-17-00816-CV, 2019 WL 4065017, at *18 n.19 (Tex. App.—Houston [1st Dist.] Aug. 29, 2019, no pet.) (mem. op.); *Sullivan v. Arguello Hope & Assocs., PLLC*, No. 03-18-00144-CV, 2018 WL 6424200, at *1 n.2 (Tex. App.—Austin Dec. 7, 2018, no pet.) (mem. op.) ("Because the parties are familiar with the facts of the case and its procedural history, we do not recite them in this opinion except as necessary to advise the parties of the Court's decision and the basic reasons for it.").

[16] The charge to the jury instructed that CenterPoint was negligent if: (1) "the condition posed an unreasonable risk of harm"; (2) CenterPoint "knew or should have known of the dangers"; and (3) CenterPoint "failed to exercise ordinary care to protect" Wilder "from the danger, by both failing to adequately warn" Wilder "of the condition and failing to make that condition reasonably safe."

## Texas Civil Practice and Remedies Code Chapter 95

In a portion of its first issue, CenterPoint argues that the trial court erred in rendering judgment in Wilder's favor on his negligence claim because Wilder's claim was barred as a matter of law by Texas Civil Practice and Remedies Code chapter 95.

Chapter 95 limits a property owner's liability when an independent contractor or its employee, who was hired to "construct[t], repai[r], renovat[e], or modif[y]" an improvement to the owner's property, brings a "claim for damages caused by negligence" that "arises from the condition or use" of that improvement. TEX. CIV. PRAC. & REM. CODE ANN. §§ 95.001, 95.002; *see also Priority Artificial Lift Servs., LLC v. Chiles*, 698 S.W.3d 1, 13 (Tex. App.—Houston [14th Dist.] 2024, no pet.) ("Chapter 95 applies to all negligence claims that arise from either a premises defect or a property owner's negligent activity."). A property owner has the initial burden of establishing the applicability of chapter 95. *Los Compadres Pescadores, L.L.C. v. Valdez*, 608 S.W.3d 829, 834–35 (Tex. App.—Corpus Christi–Edinburg 2019), *aff'd*, 622 S.W.3d 771 (Tex. 2021).

If the owner meets its burden to conclusively establish the above elements, a plaintiff cannot recover on his negligence claim against a property owner unless he shows that:

(1)    the property owner exercised or retain[ed] some control over the manner in which the work [was] performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and

(2)    the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.003; *Rueda v. Paschal*, 178 S.W.3d 107, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (if defendant meets its burden of establishing that chapter 95 applies, then plaintiff must establish that defendant had control and actual knowledge).

Notably, if chapter 95 applies to the plaintiff's claim, it is the plaintiff's "sole means of recovery," and it imposes a more onerous evidentiary requirement on the plaintiff to establish his entitlement to recovery.[17] *See Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 51 (Tex. 2015); *Lopez v. Ensign U.S. S. Drilling, LLC*, 524 S.W.3d 836, 842 & n.3 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (explaining if chapter 95 applies, property owner is not liable unless it retained control over manner in which work was performed and had actual knowledge of condition resulting in the injury but failed to warn; both control and actual knowledge must be established before property owner will incur liability).

---

[17]    Under the common law, a property owner can be liable for premises liability or negligence that harms an independent contractor or its employee if the owner controlled the work and "either knew or reasonably should have known of the risk or danger." *Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 561 (Tex. 2016).

## A.     Applicability of Chapter 95

CenterPoint first argues that Texas Civil Practice and Remedies Code chapter 95 applies to this case because it is a "property owner being sued by Wilder, an employee of a contractor, for personal injuries arising from the condition or use of an improvement to real property his employer was hired to repair, renovate, or modify."  (Internal quotations omitted.)

CenterPoint has the burden of establishing the applicability of chapter 95.  *See Valdez*, 608 S.W.3d at 834–35.  Texas Civil Practice and Remedies Code chapter 95 applies to a claim: (1) for damages caused by negligence resulting in personal injury, death, or property damage, (2) asserted against a person or entity that owns real property primarily used for commercial or business purposes, (3) asserted by an owner, contractor, or subcontractor or an employee of a contractor or subcontractor, and (4) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.  *Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 782 (Tex. 2021); *see* TEX. CIV. PRAC. & REM. CODE ANN. §§ 95.001, 95.002.  Whether chapter 95 applies is a question of statutory construction that we review de novo. *Abutahoun*, 463 S.W.3d at 51; *Phillips v. The Dow Chem. Co.*, 186 S.W.3d 121, 130 (Tex. App.—Houston  [1st Dist.] 2005, no pet.).

The parties do not dispute that the first and third requirements for chapter 95 to apply are met, but they disagree as to whether CenterPoint qualifies as a property owner under chapter 95 and whether Wilder's claim arises from the condition or use of an improvement to real property. Thus, we focus on those two requirements.

Chapter 95 defines "[p]roperty owner" as "a person or entity that owns real property primarily used for commercial or business purposes." TEX. CIV. PRAC. & REM. CODE ANN. § 95.001(3) (internal quotations omitted). Wilder, in his briefing, does not challenge the "primarily used for commercial or business purposes" portion of the definition, but instead focuses on whether CenterPoint, as the owner of the public utility easement[18] on which Wilder was injured, owned "real property."

Chapter 95 does not define "real property," thus, we must look to its common, ordinary meaning. *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014). To determine a word's common, ordinary meaning, we consider a wide variety of sources, including dictionary definitions, treatises and commentaries, our own prior constructions of the word in other contexts, the use and definitions of the word in other statutes and ordinances, and the use of the words in our rules of evidence and procedure. *Id.*; *see also Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555,

---

[18]  The parties do not dispute that CenterPoint owns the public utility easement on which the concrete transmission pole involved in Wilder's fall is located.

563 (Tex. 2016) (in chapter 95 case, considering Black's Law Dictionary definition of "entity" in determining ordinary meaning).

Black's Law Dictionary defines "real property" as "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land"; "*[r]eal property can be* either corporeal (soil and buildings) *or incorporeal (easements)*." *Property*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added); *see also* TEX. EST. CODE ANN. § 22.030 ("'Real property' includes estates and interests in land, whether corporeal or incorporeal or legal or equitable."). This definition is consistent with how Texas courts have characterized easements in the past. *See, e.g.*, *Reed v. City of Waco*, 223 S.W.2d 247, 255 (Tex. App.—Waco 1949, writ ref'd) ("[A]n easement is real property . . . ."); *see also Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983) ("[A]n easement is an interest in land which is subject to the Statute of Frauds.")[19]; *Target Corp. v. D&H Props., LLC*, 637 S.W.3d 816, 830 (Tex. App.—Houston [14th Dist.] 2021, pet. denied) (easements are "real property interests"); *Thompson v. Clayton*, 346 S.W.3d 650, 654 (Tex. App.—El Paso 2009, no pet.) ("[A]n easement constitutes an interest in the land itself . . . ."); *Markley v. Christen*, 226 S.W. 150, 153 (Tex. App.—San Antonio 1920, writ dism'd w.o.j.) (easement "implies an

---

[19] Conveyances of real property are subject to the statute of frauds. *See ETC Tex. Pipeline, Ltd. v. XTO Energy Inc.*, 698 S.W.3d 915, 922 (Tex. App.—Eastland 2024, pet. granted, judgm't vacated w.r.m.).

interest in land"); *Land*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "land" as "[a]n immovable and indestructible three-dimensional area consisting of a portion of the earth's surface, the space above and below the surface, and everything growing on or permanently affixed to it"; "[a]n estate or interest in real property"). Further, in *Oncor Electric Delivery Co. v. Murillo*, we described the defendant, an electrical utility provider, as a "possessor of *land*," when it owned a public utility easement filed in the Dallas County real property records. 449 S.W.3d 583, 590 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (emphasis added) (internal quotations omitted) (treating easement as real property in common-law premises liability case; chapter 95 not raised by parties); *Land*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Reyna v. Ayco Dev. Co.*, 788 S.W.2d 722, 724 (Tex. App.—Austin 1990, writ denied) (explaining owner of public utility easement had been transferred possession and control of premises). And we have stated, albeit in a different context, that "property" means a "real property interest[,] such as fee simple, title, a leasehold, or an easement." *City of Houston v. Northwood Mun. Util. Dist. No. 1*, 73 S.W.3d 304, 310 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (internal quotations omitted).

Thus, based on the foregoing, we conclude that the public utility easement involved in this case constitutes "real property," and CenterPoint, as the owner of that public utility easement, "owns real property" as required to meet the definition

38

of "[p]roperty owner" under Texas Civil Practice and Remedies Code chapter 95. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.001(3) (internal quotations omitted); *see, e.g.*, *Mendoza v. Clingfost*, No. 12-08-00315-CV, 2010 WL 827295, at *3 (Tex. App.—Tyler Mar. 10, 2010, no pet.) (mem. op.) (to constitute "property owner" under chapter 95, person or entity need not hold fee simple title in property (internal quotations omitted)).  As such, CenterPoint has established the first requirement for the applicability of chapter 95 to Wilder's negligence claim.

We next turn to whether Wilder's negligence claim arises from the condition or use of an improvement to real property.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.002(2) (chapter 95 applies to claim "that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement").  Wilder asserts that the concrete transmission pole from which he fell did not constitute an "improvement" under chapter 95.

"[I]mprovement" is not defined in chapter 95, but because the statutory language is unambiguous, we "need only look at the plain meaning of the statute." *Kelly v. LIN Television of Tex., L.P.*, 27 S.W.3d 564, 570 (Tex. App.—Eastland 2000, pet. denied) (determining what constituted improvement under chapter 95). Black's Law Dictionary defines "improvement" as "[a]n addition to property, usu[ally] real estate, whether permanent or not; esp[ecially], one that increases its

39

value or utility or that enhances its appearance." *Improvement*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Kelly*, 27 S.W.3d at 570 (in chapter 95 case, citing Black's Law Dictionary definition of "improvement"). Texas courts analyzing chapter 95 have stated that "[a]n improvement includes all additions to land other than trade fixtures that can be removed without injury to the property," and they have defined improvement as "[a] valuable addition made to property (usually real estate) . . . [that is] intended to enhance its value, beauty or utility or to adapt it for new or further purposes." *Mendoza*, 2010 WL 827295, at *4 (second alteration in original) (internal quotations omitted). This can include such things as "a street, sidewalk, [or] sewer utilities." *Id.* (internal quotations omitted). Notably, the Texas Supreme Court has encouraged a "broad" definition of the term "improvement" under chapter 95. *See Elmgren*, 505 S.W.3d at 568 (internal quotations omitted); *see also Abutahoun*, 463 S.W.3d at 49 (noting court had "broadly defined" term "improvement" (internal quotations omitted)); *Torres v. Chauncey Mansell & Mueller Supply Co.*, 518 S.W.3d 481, 488 (Tex. App.—Amarillo 2017, pet. denied) (term "improvement" must have "a broad reach or definition" (internal quotations omitted)).

Here, Wilder fell from a concrete electric transmission pole that he was repairing.[20] Consistent with other Texas appellate court decisions, we conclude that the transmission pole involved in this case constituted an "improvement" as contemplated by chapter 95.[21] *See, e.g.*, *Kelly*, 27 S.W.3d at 567, 570 (concluding television transmission tower was "an improvement" under chapter 95); *Torres*, 518 S.W.3d at 485–91 ("energized overhead main electric utility line" constituted improvement under chapter 95); *see also Mendoza*, 2010 WL 827295, at *4 (including public utilities in definition of "improvement" under chapter 95); *Brocken v. Entergy Gulf States, Inc.*, 197 S.W.3d 429, 432, 437 (Tex. App.—Beaumont 2006, no pet.) (parties did not dispute that chapter 95 applied where plaintiff suffered injury "during a construction project that involved moving an energized distribution line from an old [electric transmission] pole to a new pole").

As previously noted, for Texas Civil Practice and Remedies Code chapter 95 to apply to this case, CenterPoint was required to establish that: (1) Wilder's claim was for damages caused by negligence resulting in personal injury, death, or property damage; (2) CenterPoint was an entity that owned real property primarily

---

[20] Wilder alleged in his third amended petition that at the time of his fall, he was repairing CenterPoint's concrete electric transmission pole number 18376. He also testified to such at trial.

[21] We note that even a "portable toilet" has been considered an improvement under chapter 95. *See James v. Cousins Props. Tex., L.P.*, No. 03-06-00617-CV, 2008 WL 2220016, at *1–4 (Tex. App.—Austin May 30, 2008 no pet.) (mem. op.) (applying chapter 95 where contractor's employee injured by "portable toilet").

used for commercial or business purposes; (3) Wilder was an owner, contractor, or subcontractor or an employee of a contractor or subcontractor; and (4) Wilder's claim arose from the condition or use of an improvement to real property where the contractor or subcontractor constructed, repaired, renovated, or modified the improvement. *Valdez*, 622 S.W.3d at 782; *see* TEX. CIV. PRAC. & REM. CODE ANN. §§ 95.001, 95.002. Based on our above discussion, we hold that CenterPoint met its burden of establishing the applicability of chapter 95 to Wilder's negligence claim as a matter of law.

We now turn to whether Wilder established that CenterPoint exercised or retained control over the manner in which his work was performed and had actual knowledge of the condition resulting in Wilder's injury, but failed to adequately warn, so that his negligence claim is not barred by chapter 95. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003; *Rueda*, 178 S.W.3d at 111 (if defendant meets its burden of establishing that chapter 95 applies, then plaintiff must establish that defendant had control and actual knowledge).

## B. Actual Knowledge

CenterPoint argues that Wilder did not meet his burden of establishing that his claim was not barred by Texas Civil Practice and Remedies Code chapter 95 because he did not obtain a jury finding on "actual knowledge" and there was no evidence that CenterPoint had actual knowledge of the alleged danger or condition.

Texas Rule of Civil Procedure 279 provides that if an essential element of an independent ground of recovery is not submitted to the jury, that independent ground is waived unless it is conclusively established. TEX. R. CIV. P. 279; *see also United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 480–81 (Tex. 2017); *Little Rock Furniture Mfg. Co. v. Dunn*, 222 S.W.2d 985, 990 (Tex. 1949) (explaining before a party is entitled to judgment, it must satisfy its burden of obtaining jury findings in its favor on every essential element of its claim). When Texas Civil Practice and Remedies Code chapter 95 applies to a case, the plaintiff must prove that the property owner "had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage" before the property owner may be held liable for its negligence. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(2); *Elmgren*, 505 S.W.3d at 561. "Actual knowledge" is an essential element to be established for a plaintiff to prevail on a negligence claim under chapter 95. *See Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 92–93 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *see also Valdez,* 622 S.W.3d at 786 ("Because chapter 95 applie[d] to [plaintiffs'] claims, they were required to obtain a jury finding that 'the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.'" (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(2))).

Here, the trial court's charge to the jury asked: "Did the negligence, if any, of CenterPoint . . . proximately cause the occurrence in question?"  It then instructed the jury that, "[w]ith respect to the conditions of the premises, CenterPoint . . . was negligent" if: (1) "the condition posed an unreasonable risk of harm"; (2) "CenterPoint . . . knew or *should have known* of the danger"; and (3) "CenterPoint . . . failed to exercise ordinary care to protect . . . Wilder from the danger, by both failing to adequately warn . . . Wilder of the condition and failing to make that condition reasonably safe."[22]  (Emphasis added.)  This question did not require the jury to find that CenterPoint had "actual knowledge of the danger or condition resulting in the personal injury, death, or property damage" as mandated by chapter 95.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(2); *cf.* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises & Products* PJC 66.14 (pattern jury charge for cases governed by chapter 95 instructing that jury may find property owner negligent if it "had actual knowledge of the danger").

In his briefing, Wilder acknowledges the lack of a jury finding on actual knowledge, but he asserts that the lack of a jury finding is not fatal because the

---

[22]     CenterPoint objected to the trial court's instruction because it allowed the jury to find that CenterPoint had constructive knowledge, and CenterPoint requested an instruction on actual knowledge.  The trial court overruled CenterPoint's objection and refused its proposed instruction on actual knowledge.

44

evidence conclusively established that CenterPoint had "actual knowledge of the danger or condition." *See* TEX. R. CIV. P. 279; *Wilz v. Flournoy*, 228 S.W.3d 674, 676–77 (Tex. 2007) (noting when defendants "failed to obtain a jury finding on their affirmative claim," it was "waived on appeal unless they conclusively established it" (internal quotations omitted)). Thus, we now consider whether "actual knowledge" was conclusively established by Wilder at trial.

"Actual knowledge requires knowledge that the dangerous condition existed at the time of the [incident], as opposed to constructive knowledge[,] which can be established by facts or inferences that a dangerous condition could develop over time." *Elmgren*, 505 S.W.3d at 568 (second alteration in original) (internal quotations omitted). To conclusively establish actual knowledge, "the evidence must leave no room for ordinary minds to differ as to the conclusion to be drawn from it." *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019) (internal quotations omitted). Simply put, actual knowledge "is what a person actually knows." *Rawson v. Oxea Corp.*, 557 S.W.3d 17, 30 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd by agr.).

"Circumstantial evidence establishes actual knowledge only when it either directly or by reasonable inference supports that conclusion." *Elmgren*, 505 S.W.3d at 568 (internal quotations omitted). Evidence that a defendant should have known "does not support a reasonable inference that [the defendant] had actual knowledge

45

of the danger . . . , even when viewed in the light most favorable to the [plaintiff]." *Rawson*, 557 S.W.3d at 32–33.

At trial, Wilder testified that as he climbed the concrete transmission pole on the day of his fall, he did not find any missing step bolts. He also did not find any loose step bolts or ones that caused him concern. He checked each step bolt before he put his weight on it. When Wilder clipped his lanyard into the step bolt that eventually fell out of the concrete transmission pole, it did not move or shake. Wilder checked the step bolt to make sure it was tightened into the insert properly before clipping into it. According to Wilder though, at the time of his fall, the step bolt to which his lanyard was clipped came out without warning; it failed suddenly. There was no warning or indication to Wilder that something had been wrong with the step bolt.

McClain, the L.E. Myers employee who installed the step bolt which came out of the concrete transmission pole, testified that he would have checked to make sure that the step bolt was tight when he installed it in February 2019. At the time of installation, he put his weight on the step bolt, and he did not notice any problems with the bolt. The step bolt did not appear dangerous to McClain, and McClain did not believe that there was any danger that the step bolt would come out of the concrete transmission pole.

Further, McClain explained that he watched Wilder climb the concrete transmission pole on the day of his fall, and there were no indications that Wilder was having any problems climbing. Wilder specifically checked the step bolts before he put his weight on them, and there was nothing to indicate that there was a problem with the step bolt that came out of the concrete transmission pole.

Ross, one of Wilder's expert witnesses at trial, testified that he believed that the insert inside of the concrete transmission pole must have been damaged and that is what caused Wilder's fall. However, Ross also explained that he did not have any experience with the type of insert failure involved in this case, and he did not know how the insert was damaged or why it had failed. Instead, testing completed by CenterPoint both before and after Wilder's fall showed that the step bolts and insert involved in the case met OSHA's requirements.

Ross further opined that the fact that L.E. Myers installed the wrong length of step bolts in the concrete transmission pole would not have caused bottoming out to have occurred. Ross did not believe that the particular step bolt involved in Wilder's fall had been "overtorqued" either, and it did not appear to him that the step bolt had "bottomed out." There was also no evidence that cross-threading had occurred.

In Ross's opinion, Wilder's fall was sudden and unexpected. Ross did not know why the insert broke in the concrete transmission pole, and according to Ross, CenterPoint should not have anticipated that the insert would fail "on the day of the

47

accident." The failure of the step bolt and insert was sudden and without warning; no one would have known that the step bolt and insert would fail and that Wilder would fall.

Additionally, Ross believed that Jackson, CenterPoint's employee who had previously climbed the concrete transmission pole, would not have been aware of a problem with the step bolt before Wilder fell. This was because, even if Jackson encountered a loose step bolt during his climb, a loose step bolt did not necessarily indicate a problem with the insert in the concrete transmission pole, and if Jackson was able to tighten the loose step bolt, there would have been no indication to him that an insert in the pole was broken. Further, there was no evidence that Jackson had in fact tightened the specific step bolt from which Wilder fell.

Finally, Mach, another expert witness for Wilder, testified that there were no known hazards related to the condition of the concrete transmission pole before Wilder's fall. As to the reason for Wilder's fall, Mach stated that he had not seen any evidence that the insert involved in this case had "bottomed out." Mach did not know why the step bolt involved in Wilder's fall had failed. The step bolt had been installed close to the appropriate insertion depth, and it was installed correctly, even if it was the wrong length. The step bolt did not show any signs of distress or bending. Instead, in Mach's opinion, the insert in the concrete transmission pole

suddenly failed, without warning to anyone. There was no way for anyone to know that the step bolt would fail and no forewarning.[23]

According to Mach, L.E. Myers had never told CenterPoint that it was unable to install step bolts into the concrete transmission pole or that any inserts in the pole were damaged. L.E. Myers also never reported to CenterPoint that there were any hazardous conditions about the concrete transmission pole. If Wilder had checked the step bolt before he put his weight on it, and there was no indication of a problem, there would have been no notice that the step bolt was any kind of hazard.

Based on the foregoing, we conclude that Wilder did not conclusively establish at trial that CenterPoint had "actual knowledge of the danger or condition" that resulted in Wilder's injury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(2). Accordingly, we hold that Wilder did not meet his burden of establishing that chapter 95 did not bar his negligence claim against CenterPoint, and the trial court erred in rendering judgment in favor of Wilder. *See Oiltanking Houston, L.P. v. Delgado*, 502 S.W.3d 202, 208 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (if there is no evidence of actual knowledge, then liability is foreclosed).

---

[23] Mach noted that Jackson, the CenterPoint employee, did not have any problems with the step bolts in the concrete transmission pole after he tightened them on March 7, 2019.

49

We sustain this portion of CenterPoint's first issue.[24]

## Conclusion

We reverse the trial court's judgment and render judgment that Wilder take nothing on his claim against CenterPoint.



Kristin Guiney
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.

---

[24] Due to our disposition of this portion of CenterPoint's first issue, we need not address its remaining arguments. *See* TEX. R. APP. P. 47.1.